UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC WEATHERS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 5493 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FEDEX CORPORATE SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Eric Weathers, a former employee of Defendant FedEx Corporate Services, Inc., has filed this suit seeking damages for an alleged hostile work environment, constructive discharge, failure to accommodate, retaliation, religious discrimination, and intentional infliction of emotional distress. R. 26.[1] FedEx has moved for summary judgment on all of Weathers's claims. R. 28. As explained below, FedEx's motion for summary judgment [R. 28] is granted in part and denied in part. The sole claim on which Weathers has raised a genuine issue of material fact is the claim that FedEx failed to accommodate his religious beliefs.

---

[1] Citation to the record is "R." followed by the docket entry. The Court has jurisdiction under 28 U.S.C. § 1331 in light of the federal claims. The Court has jurisdiction over Weathers's state-law emotional distress claim pursuant to 28 U.S.C. § 1367, as that claim is related to the claims over which the Court has original subject matter jurisdiction.

## I.

### A.    Background

The following facts are drawn from the parties' Local Rule 56.1 materials,[2] and are presented in the light most favorable to Weathers, the non-moving party, with all reasonable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 639 (7th Cir. 2010). Weathers began working for FedEx around 1988, and was promoted to Direct Sales Manager in Chicago in 2007. R. 28-2 ¶ 1. Weathers described himself as a conservative evangelical Christian. R. 38 PSOF ¶ 2. He belonged to an internal organization comprised of Christian FedEx employees. R. 28-2 ¶ 26. Additionally, Weathers was invited to speak at FedEx sales conferences about his faith. *Id.*

Before Weathers's promotion, he worked in the Worldwide Services Division in Tennessee. R. 28-2 ¶ 2. After he was promoted, Weathers reported to Barbara Mahoney, who reported to Dave Russell. *Id.* ¶ 3. In June 2007, Mahoney was replaced by Kym Kyker, who still reported to Russell. *Id.* ¶ 6; R. 38, PSOF ¶ 24. Kyker served as Weathers's direct supervisor until he was demoted in 2008. R. 28-2 ¶ 7.

---

[2]FedEx's initial Local Rule 56.1(a)(3) statement of material facts is at R. 28-2. Weathers responds in R. 38, but in the same filing, Weathers also submitted additional facts under Local Rule 56.1(b)(3)(A). Weathers's additional facts restart the paragraph numbering, which means his filing has overlapping paragraph numbers (*e.g.*, there is FedEx's paragraph one and Weathers's paragraph one, and so on). To minimize confusion, Weathers's *additional* facts, which begin on page 18 of R. 38, will be cited as "PSOF." Any other citation to R. 38 will refer to Weathers's response to FedEx's statement of facts. Lastly, R. 46 is FedEx's response to Weathers's additional facts asserted in R. 38. Any citation to R. 46 refers to FedEx's response to Weathers's statement of additional facts, which begins on page 25 of R. 46.

### B. 2007 Counseling Letter

In August 2007, one of Weathers's direct reports, Aprile Abernathy-Ferguson, filed an internal complaint alleging that Weathers discriminated against her. *Id.* ¶ 9. Abernathy's complaint alleged that Weathers quoted scripture to her on multiple occasions and that he discussed his religion in an uncomfortable and offensive manner. *Id.* ¶ 10. In particular, Weathers quoted a portion of the Bible that says a slave should be obedient to his master. *Id.* ¶ 11. Weathers contends that he never admitted to discussing that passage, R. 38 ¶ 12, but in fact Weathers explicitly admits in his deposition that he discussed the "slave/master passage" with Abernathy, Weathers Dep. at 71, and Weathers does not try to explain the discrepancy. FedEx alleges that Weathers specifically told Abernathy that she was his slave. R. 28-2 ¶ 11. In contrast, Weathers states that he only explained to Abernathy that the modern understanding one should give to the "slave/master" passage is that it is akin to an employer/employee relationship. Weathers Dep. at 72-73. More generally, Abernathy complained that Weathers spoke to her in a harsh and condescending manner and made comments that were degrading and mean. R. 28-2 ¶ 15.

To assess the truth of Abernathy's complaint, Kyker and other Human Resources (HR) personnel conducted an investigation. *Id.* ¶ 16. The investigation included interviewing the other employees who directly reported to Weathers. *Id.* These employees raised some concerns about Weathers's leadership style in their reports. *Id.* ¶¶ 17-19. But none of the direct reports described Weathers's conduct as

inappropriate. While the investigative team identified leadership concerns, when all of the direct reports were asked whether Weathers's conduct was ever inappropriate, they all answered "no." R. 28-6 at 2-9. Additionally, all of the direct reports stated that Weathers was a "fair" manager, "fair" in the sense of treating the employees equally. R. 38, PSOF ¶ 8. At the conclusion of the investigation, FedEx did not find that Weathers committed a policy violation, but the leadership concerns led Kyker and Russell to issue a "Letter of Counseling" to Weathers. R. 28-2 ¶¶ 20-21.

A letter of "counseling" is an internal coaching tool employed by FedEx, and should be contrasted with the more serious letter of "warning," which prohibits the recipient from applying for other positions. *Id.* ¶ 23. The counseling letter was issued on October 15, 2007. *Id.* ¶ 21. The letter opened by acknowledging that Weathers had not committed a specific violation of the company's religious discrimination policy. *Id.* But the letter did command that Weathers's discussions of religion with other employees, even if initiated by others employees, "must cease." *Id.* Additionally, the letter identified the leadership concerns expressed by Weathers's direct reports, and indicated that Weathers would be assigned a mentor, and that Kyker would conduct "future . . . meetings with [Weathers's] team to ensure the morale and support is being administered properly." *Id.* The letter closed by stating: "Eric, you are a valuable member of this team[,] and I will expect to see some progress with regard to leadership and support for your team." *Id.* Shortly before issuing the letter, Kyker praised Weathers for a "stellar" career at FedEx. R. 38, PSOF ¶ 11.

4

It is not clear who authored the letter of counseling, or if there was a primary author. Kyker testified in her deposition that she drafted the letter with collaboration from HR and Russell. Kyker Dep. at 8-9. Russell testified that a director of sales such as Kyker is typically not the primary author of these letters, Russell Dep. 16, and that typically HR drafts these letters in conjunction with the legal department and with the director of sale's input. *Id.* Russell testified that he had no real hand in drafting the letter, other than a discussion with Kyker where he acknowledged the situation with Weathers's leadership and agreed that action needed to be taken. *Id.* at 17. Russell testified that he (Russell) agreed with the "sentiment" of the letter. *Id.*

### B.    October-November 2007

In what turns out to be an important fact, on October 16, 2007, Weathers sent an email to Kyker and Jim Wallace, an HR representative. R. 28-2 ¶ 27. The email asked for "clarity" regarding how Title VII prohibits Weathers from discussing religion. *Id.* ¶ 27. In the email, Weathers cites a passage of Scripture (First Peter 3:15-17, which instructs to "be ready always to give an answer to every man that asketh you a reason of the hope that is in you") that Weathers believed obligated him to answer questions about his religion. *Id.* In closing, Weathers asked "At what point and in what physical location(s) does Title VII permit me, and other FedEx employees to answer such genuinely posed questions?" *Id.* Weathers refers to this email as a request for religious accommodation. *Id.* ¶ 28. Weathers did not receive a response to this email. R. 38, PSOF ¶ 16. Additionally, after receiving the letter of counseling, Weathers asked how

5

he should explain his college degree, which is in Bible and Youth Ministries. *Id.* ¶ 17. Kyker said that Weathers should tell others that he holds a "theology" degree, and she concluded the conversation by leaving the room promptly. *Id.* Following this discussion, Weathers also tried asking Jim Wallace of HR about the extent to which Weathers could discuss his faith. *Id.* ¶ 18. Wallace told Weathers that he could not discuss religion because it was a "detrimental act." *Id.*

On October 26, 2007, Kyker phoned Weathers to discuss his team's sales results. R. 28-2 ¶¶ 29-30. Kyker was "very disappointed" with his team's performance. *Id.* Additionally, Kyker expressed disappointment that Weathers had not fired under-performers from his team. *Id.* Weathers does not deny that this conversation occurred, but argues that Kyker's views regarding team performance and firings were wrong. R. 38 ¶ 30. At that meeting, however, Weathers agreed that his team had not "done a great job." Weathers Dep. at 132. These issues had been discussed with Weathers and other district sales managers before that date and before the letter of counseling issued. R. 28-2 ¶ 31.

According to Weathers, he attempted to fire the under-performers on his team. R. 38, PSOF ¶ 31. To facilitate firing an employee, Weathers had to compile an extensive document called a request for termination. Weathers Dep. at 64. Weathers compiled a termination request for every employee he was asked to. *Id.* ¶¶ 31-36. His termination request for one employee was denied by HR, three of the employees left before he could compile a termination request, and he stopped the termination request

6

process for Aprile Abernathy after she filed her internal complaint against Weathers. *Id.* As for three employees who left on their own accord, it is not clear whether Weathers began compiling the termination request and was interrupted when the employees left, or if he never started the process at all. *Id.*

On November 2, 2007, Kyker sent an email to her team with the subject "FW: CBT status." R. 28-6 at 10. CBT stands for "Closed Business Tracking." Kyker Dep. at 20. Closed business tracking numbers were used to monitor revenue. *Id.* at 21. The email stated in the body: "Team[/][3] The big man is watching. [/] Ck your numbers." R. 28-6 at 10. Attached to the email was a picture of three signs that one would see in front of a church. *Id.* at 11. One sign says, "First Baptist Church." *Id.* A second sign lists times of worship. *Id.* A third sign, one on which the letters can physically be changed to display a custom message, reads "GOD HAS SEEN [/] YOUR CBT NUMBERS [/] YOU'RE GOING TO [/] HELL!" *Id.* The email was forwarded by Kyker to her team. Kyker Dep. at 21. Kyker did not make the picture, but received it from another FedEx employee, John Whittington, who had sent it to Kyker and one other employee (who has no connection to this litigation). *Id.* Whittington sent the original email on October 26, a few days before Kyker forwarded it, and the original email stated: "Being from the South, you both wouldn't happen to be Baptist, would you?" R. 28-6 at 10. Additionally, Kyker herself raised, with Weathers, a religious topic at some

---

[3]The "/" symbol that has been added in brackets denotes a line break in the emails and the picture attached to the emails.

point after this email, namely, when she asked Weathers to provide a definition for the term "atheist." R. 38, PSOF ¶ 13.

### C.    January 2008 Inadvertent Email

Early the next year, Weathers did make a mistake, demonstrating the danger of wide-broadcast emails. In January 2008, Weathers sent an email containing confidential information to his *entire* group of direct reports. R. 28-2 ¶ 32. The email contained confidential information about his direct reports, including disciplinary history and planned disciplinary actions, and naturally the information was not supposed to be seen by the direct reports. *Id.* ¶¶ 32-33. Weathers had intended to send the email to his administrative assistant for revision and proofreading, but instead he sent the email to his entire team. *Id.* ¶ 34. Weathers immediately contacted Kyker and Wallace (the HR representative), who both told him that it was not a big deal. R. 38, PSOF ¶¶ 21-22. In response to the email, Abernathy filed a second internal complaint against Weathers. R. 28-2 ¶ 35.

Also in January 2008, but after the email incident, Kyker and Russell met with Weathers to discuss his performance. *Id.* ¶ 38. Russell asked Weathers how he could regain the trust of his direct reports. *Id.* ¶ 39. Russell and Kyker also encouraged Weathers to think about stepping down from his position because of the damaged trust which Weathers's team had in him. *Id.* At this meeting, Weathers alleges, Russell said that Weathers could be sued personally for the email, and that Weathers should leave the company to avoid the potential litigation. R. 38, PSOF ¶ 24.

In comparison, Weathers argues that another District Sales Manager made a similar mistake but was not fired. Jason Blickhan was a fellow District Sales Manager who erroneously sent a voicemail to his direct reports when he intended to send the voicemail to his director. *Id.* ¶ 25. According to Weathers, the voicemail contained "confidential information similar to what Weathers had emailed." *Id.* Blickhan was given a letter of counseling in response to this issue. *Id.* (Weathers also alleges that Russell committed a "similar error," but provides no further details. *Id.* ¶ 26.)

### D.     February 2008 Counseling Letter

A second letter of counseling was issued on February 14, 2008. R. 28-2 ¶ 36. The letter of counseling did not refer to the email Weathers mistakenly sent to his entire team. *Id.* The letter of counseling raised concerns with his team's performance in the previous two quarters, but Weathers denies ever receiving this second letter. R. 28-2 ¶ 36; R. 38 ¶ 36. In response, FedEx proffers an email to Weathers, sent February 14, 2008, with the subject "Letter Of Counseling." R. 46-1. The email does not bear any mark showing that there was an attachment. *Id.* The letter says in part "Please take a look at the letter for Q2." *Id.* It then requests a response action plan from Weathers. *Id.* In reply to Kyker's email, Weathers asks for an extension to submit his plan, but there is no mention that he did not receive a letter. *Id.*

Also in February 2008, Kyker received Weathers's PULSE report. R. 28-2 ¶ 41. A PULSE report is an anonymous survey of managers conducted by the managers'

subordinates. *Id.* Weathers's scores were below average in all categories of the PULSE report. *Id.* ¶ 42.

### E.    February 2008 Warning Letter & Resignation

On February 19, 2008, Russell and Kyker issued Weathers a letter of warning for failing to meet expectations. *Id.* ¶¶ 43-44. Weathers was removed from his managerial position and placed in an "individual contributor" position. *Id.* ¶ 43. The letter of warning cited, as reasons for the demotion, Weathers's email mistake and leadership failures. *Id.* Weathers's salary remained the same, and he continued to receive his "car allowance." *Id.* ¶ 46. Weathers's bonus potential  was reduced. R. 38, PSOF ¶ 28. In the new position, Weathers no longer reported directly to Kyker. R. 28-2 ¶ 47. In July 2009, Kyker also  moved another employee from a District Sales Manager position to a Corporate Sales position due to poor performance. *Id.* ¶ 48.

Although Weathers no longer reported to Kyker, he believed that Kyker had an ongoing dislike for him, and that, at least in part, Kyker's presence in the company would ultimately lead him to fail. *Id.* ¶ 50. Weathers testified that he believed Kyker "had it in" for  him. Weathers Dep. at 192. Ultimately, Weathers submitted a letter of resignation on March 17, 2008, setting his final day of employment as March 31. R. 28-2 ¶ 51. The letter continues:

> I have enjoyed what many have said to be a 'stellar career' with the company and I am grateful for nearly twenty years of employment. . . . I am also thrilled to have worked with leaders at FedEx who have been models of integrity and for the fellow employees  who were dedicated to the People-Service-Profit philosophy which make[s] FedEx a most admirable employer.

*Id.* Weathers admits that he submitted this letter of resignation, but that he believed he was terminated or forced out of FedEx. *Id.*

Weathers filed this action against FedEx alleging religious discrimination, retaliation, failure to accommodate, and a hostile work environment, all in violation of Title VII. R. 26. Additionally, Weathers alleges that FedEx caused intentional infliction of emotional distress under Illinois common law. For the reasons stated below, FedEx's motion for summary judgment is granted in part and denied in part.

## II.

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment will be granted against "a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.

### A.    Title VII - Hostile Work Environment (Count I)

Weathers's federal claims are all grounded in Title VII. Title VII prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Weathers alleges that he was subjected to hostile work environment discrimination on account of his religion, Christianity. When harassment, based on a protected classification, alters the terms and conditions of one's employment, it falls within the scope of Title VII's prohibition against discrimination. *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999). In order to survive summary judgment, Weathers must present evidence from which a reasonable juror could find that the hostile work environment was motivated by membership in a protected class; otherwise, the conduct does not violate Title VII. *Id.* But not all offensive behavior violates the law; Title VII does not codify civility. *Oncale*

*v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998). There are two elements to a hostile work environment claim: (1) the offensive conduct must be *based* on the protected characteristic – here, religion; and (2) the hostile conduct must be so severe and pervasive as to alter the terms or conditions of the employment relationship. *Smith*, 189 F.3d at 533. Weathers has failed to satisfy either of these elements.

Weathers has not advanced adequate evidence that the hostility, if any, he faced was due to his religion. Weathers makes only one conclusory statement in his response memorandum to forge the connection between the alleged hostility and his religion. Weathers states that the "animosity and hostile environment clearly stem from the evident difference in religious beliefs between Kyker and Weathers." R. 36 at 12. But the connection between the two is not "clear."

Although Kyker's email regarding the CBT figures invoked a religious premise (the church signs), the email was sent to her entire team, not just Weathers, and thus did not single out Weathers for religious discrimination. Indeed, the email did not actually express hostility to religion; the humor might have been ill-advised, but it was clearly an attempt at humor rather than hostility.

Weathers also argues that a jury could infer that hostility was motivated by religion because Kyker and Wallace became hostile after he submitted the email asking for clarification regarding his ability to discuss his faith at work. R. 37 at 10. But the record does not demonstrate that there was any causal connection between the alleged hostility and the email. After all, Weathers's email requesting clarification came *after* he had already received a letter of counseling for poor performance.

Additionally, Weathers had discussed poor performance with Kyker before the letter of counseling, and *before* he submitted his email asking for clarification. Weathers has not presented any facts to suggest that his supervisors acted with hostility toward his religion after he sought clarification. Weathers has not provided sufficient evidence, even when viewed in his favor, to suggest that FedEx discriminated against him because he was Christian. Accordingly, because no reasonable jury could conclude that hostility in the workplace was motivated by his religion, the summary judgment motion is granted as to Count I.

### B.    Title VII - Constructive Discharge (Count II)

Summary judgment is granted as to Count II for the same reasons that summary judgment is appropriate on the hostile work environment claim. Weathers's claim for constructive discharge fails because Weathers has not made a showing that any hostility he experienced was motivated by his religion, nor has Weathers shown the requisite level of hostility. The elements of a constructive-discharge claim are similar to those of a hostile work environment claim. A plaintiff must show that: (1) he was forced to resign because his working conditions, from the standpoint of a reasonable employee, had become unbearable; and (2) the hostility that forced resignation resulted from the plaintiff's membership in a protected class. *E.E.O.C. v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002). There is no issue of fact as to either of these elements, and Weathers's claim for constructive discharge fails.

14

The level of hostility Weathers alleges he encountered is not sufficient to qualify as a hostile work environment. Even "[u]ndoubtedly inappropriate" conduct that causes "significant discomfort and distress" is not enough. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993). A plaintiff who alleged that she was told "not to proselytize at work hardly establishe[d] [that she was subjected] to an intolerably discriminatory workplace." *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009). The working conditions to support a constructive discharge claim "must be *even more egregious* than the high standard for hostile work environment" claims. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (emphasis added). Indeed, "it is difficult for a plaintiff to show a constructive discharge." *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 428 (7th Cir. 2004). Measured by this standard, Weathers's allegations cannot support a claim for constructive discharge.

Weathers merely argues in a conclusory fashion that he experienced "egregious" hostility. R. 37 at 13. Weathers has not furnished any case in which allegations similar to his have survived summary judgment on a constructive discharge claim; they simply do not rise to the very high level they must to support this claim. Moreover, Weathers's allegations of hostility are severely undermined by the genial tone of his letter of resignation, in which he admitted that he had enjoyed his time with FedEx. Perhaps Weathers was trying to avoid burning bridges, but his letter of resignation coupled with the absence of any egregiously-hostile conduct leave no issue of fact as to the level

of hostility he experienced. Because Weathers cannot show that the alleged hostility rises to the necessary level for a constructive discharge claim, or that the alleged hostility was motivated by religion, summary judgment is also granted as to Count II.

### C.    Title VII - Religious Discrimination (Count V)

Count V of Weathers's complaint asserts a religious discrimination claim under Title VII. To prove discrimination, Weathers may use either the direct method or indirect method of proof pursuant to the *McDonnell-Douglas* framework. *See Naik v. Boehringer Ingelheim Pharm.*, 627 F.3d 596, 599 (7th Cir. 2010); *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010). Weathers has not attempted to proceed under the direct method, and thus he must make his showing under the indirect method. With the indirect method, Weathers must first show that he (1) is a member of a protected class; (2) his job performance met FedEx's expectations; (3) he suffered an adverse employment action; and (4) FedEx treated similarly situated individuals outside of his protected class more favorably. *Egonmwan*, 602 F.3d at 850; *Swearnigen–El v. Cook County Sheriff's De['t*, 602 F.3d 852, 860 (7th Cir. 2010).  If Weathers establishes these *prima facie* elements, the burden then shifts to FedEx to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Naik*, 627 F.3d at 600. If FedEx meets this burden, Weathers must demonstrate that the proffered reasons are pretext for discrimination. *Egonmwan*, 602 F.3d at 850. For purposes of this opinion, the Court assumes the first two elements have been satisfied. Thus, for every adverse action, the Court will

evaluate whether there is a similarly situated individual to fulfill the last requirement of the framework.

Not everything that makes an employee unhappy is an "adverse action." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). An adverse action must be a significant change in employment status, or a decision causing a significant change in benefits. *Id.* The letters of counseling Weathers received do not constitute an adverse action. *Sweeney v. West*, 149 F.3d 550, 556-557 (7th Cir. 1998). *Sweeney* held that counseling statements, which did not discipline the plaintiff, but admonished her to improve, were not adverse actions. *Id. Sweeney* held that counseling statements , like the counseling letters in this case, are akin to negative performance evaluations that do not rise to the level of an adverse action. *Id.* The letters that Weathers received had no material impact on his job status. His compensation, responsibilities, and title remained the same. In contrast, the involuntary change in position (when he was removed as a supervisor) does constitute an adverse action. (The parties will not agree to use the term "demotion," but the Court will use it for sake of simplicity.) Both parties agree that Weathers's potential to earn bonuses was diminished by his demotion. Although neither party provides specific figures regarding how much Weathers's potential for bonuses decreased, given the reasonable inferences to which Weathers is entitled at this stage in the litigation, the Court concludes that Weathers's demotion qualified as an adverse action.

FedEx justified the demotion on the confidential-information email Weathers mistakenly sent to his entire team, as well as on his general poor performance. To complete his *prima facie* case, Weathers must show that similarly situated individuals were treated more favorably than he was. In this case, Weathers must show that others had made a similar mistake and had a similar performance track record, but were treated more favorably than he was. Weathers cannot make that showing.

"The similarly situated analysis requires a context-based examination of all relevant factors." *Eaton v. Indiana Dep't of Corr.*, – F.3d –, 2011 WL 3966145, at *4 (7th Cir. Sept. 9, 2011). Although not an iron-clad rule, generally a plaintiff must show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct." *Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (quotation omitted). Different disciplinary history also renders a comparator dissimilar. *Id.* While the test is not meant to be so rigid as to require clone-like comparison, "the comparators must be similar enough that any differences in [] treatment cannot be attributed to other variables." *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011). Weathers has not pointed to a similarly situated employee who was treated more favorably.

Weathers relies entirely on Jason Blickhan. It is true that Blickhan was also a District Sales Manager when he made a mistake like Weathers's email broadcast. Of crucial importance though, Blickhan did *not* have Kyker as a supervisor when Blickhan mistakenly sent a voice-mail too widely. Blickhan instead reported to Barbara

18

Maloney. Weathers Dep. at 167. Without a common supervisor, Blickhan's usefulness as a comparator is undermined. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).

Weathers also contended in his statement of facts that Dave Russell "committed a similar error and no discipline was administered to him," R. 46 ¶ 26, but that is the extent of the allegations about Russell, and also deficient to satisfy the fourth element of the *McDonnell-Douglas* framework. Additionally, in his response brief, Weathers says that he was "treated less favorably than similarly situated employees," and that "other employees were not subject to the [hostility] visited upon [himself]." R. 37 at 7. Again, however, Weathers does not provide actual evidence as to these supposedly similarly situated employees. Accordingly, summary judgment is granted as to Count V.

### D.    Retaliation (Count IV)

To survive summary judgment on his retaliation claim, Weathers must show that (1) he engaged in statutorily protected activity; (2) he performed his job according to FedEx's legitimate expectations; (3) despite meeting those expectations, he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Weather's retaliation claims fails for the same reasons as his religious discrimination claim.

For the retaliation claim, Weathers does not proffer a single individual for comparison. Weathers's allegations are again conclusory: "Weathers was treated less

19

favorably than similarly situated employees who did not request an accommodation." R. 37 at 14. That is the extent of Weathers's argument, and it is insufficient to meet the fourth element of the indirect method. Accordingly, summary judgment is granted as to Weathers's retaliation claim.

### E.    Failure to Accommodate (Count III)

Weathers's final Title VII claim alleges that FedEx failed to provide him a religious accommodation. Weathers must show: (1) he had a bona fide religious belief that conflicts with an employment requirement; (2) he had informed FedEx of his religious belief; and (3) the practice or belief was the basis for an adverse employment action. *Wright v. Runyon*, 2 F.3d 214, 216 n.4 (7th Cir. 1993). If Weathers can make that showing, the burden shifts to FedEx to show that it either reasonably accommodated Weathers or that doing so would cause undue hardship. *Id.* Because there is a genuine issue of material fact with Weathers's accommodation claim, FedEx's motion for summary judgment is denied.

In order for Weathers's belief to be bona fide, the belief must be 'religious' in Weathers's own scheme or religion, and the belief must be sincerely held. *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n. 2 (7th Cir. 1978). Weathers has explicitly offered evidence that he sincerely believes that his faith obligates him to answer questions directed toward him about his faith. Weathers Dep. 115-116; 125; 176. Although FedEx argues that Weathers cannot demonstrate that he has a bona fide religious belief, R. 28-1 at 11, FedEx does not explain how or why Weathers cannot make the necessary showing. On the contrary, Weathers's belief is memorialized in the email he sent to

20

Kyker and Wallace. At the very least, Weathers has sufficient evidence to convince a jury as to his bona fide religious belief.

FedEx does not contest that it had knowledge of Weathers's religious belief, but argues that the email did not constitute a request for an accommodation. R. 28-1 at 11-12. A reasonable jury could readily conclude otherwise. To be sure, Weathers does not use the word "accommodate," but he does not need to use that magic word. Weathers's email identified the heart of the issue: his FedEx supervisors instructed him not to discuss religion, but his sincere beliefs required him, at the very least, to answer questions if others asked him about his religion. Weathers informed FedEx that "My faith directs me to be ready to give an answer to everyone who asks me to give a reason for the hope that is within me." R. 28-2 ¶ 27. Weathers wanted to know, "At what point and in what physical location(s) does Title VII permit me, and other FedEx employees to answer such genuinely posed questions?" *Id.* That question was a request for assistance from Kyker or Wallace to help resolve the tension between FedEx's directive to him and his religious belief. But there was no response. R. 38, PSOF ¶ 16.[4] Perhaps Weathers should have made more than one request for an accommodation, but for the time being, his effort is sufficient to create an issue of fact as to this element.

The final element Weathers must show is that he suffered an adverse employment action because his belief was not accommodated. Of all of the written

---

[4]Weathers cites his deposition testimony (pages 177 to 179, to be specific) for the proposition that neither Kyker nor Wallace responded. FedEx contends that the testimony does not support the asserted fact, but Weathers did testify that he told another employee that he had no response to his e-mail.

correspondence Weathers received during the relevant time period, his religion was only mentioned in the first letter of counseling. As discussed above, that letter does not rise to the level of an adverse employment action. But an employer also commits an adverse employment action when there are "changes to the employee's work conditions including subjecting [an employee] to humiliating, degrading, . . . or otherwise significant negative alteration in [his] work place environment." *Lewis*, 496 F.3d at 653. Wallace instructed Weathers not to discuss religion in the workplace, and Wallace asserted that Weathers' religious discussions were detrimental to FedEx. When Weathers asked for clarification of this policy via email, he did not receive a response. Thus, Weathers was effectively silenced, unable to exercise his religious belief and unable to discuss a subject of broad scope and of great importance to him. This situation was exacerbated by his own supervisor: Kyker herself asked Weathers about a religious topic (he was asked to define "atheist"). This placed Weathers in the uncomfortable, and perhaps humiliating, position of being told he could not discuss his religion, despite his belief that he had to do so, while simultaneously being asked to join religious conversations. A reasonable jury could conclude that this treatment constituted an adverse employment action. Thus, Weathers has established a genuine issue of fact as to whether he can establish the *prima facie* elements of a religious accommodation claim. Having done so, the burden shifts to FedEx to prove that it accommodated Weathers, or that accommodation would not be reasonable.

FedEx does not meet this burden, and summary judgment must be denied. The only argument FedEx advances regarding the feasability to accommodate is a

statement that it is not required to permit *Weathers* to create a hostile working environment for others in order to accommodate his beliefs. R. 28-1, 11. This argument is not enough to establish that there is no genuine issue of material fact that FedEx could not reasonably accommodate Weathers, and the implicit argument that any accommodation would result in a hostile work environment is dubious. FedEx instructed Weathers that he could not discuss religion even at the prompting of a co-worker, and he could not even truthfully tell a coworker what he majored in at college. To suggest that Weathers could not be accommodated without creating a hostile work environment overstates the nature of Weathers's requests for clarification. Accordingly, FedEx's motion for summary judgment is denied as to Count III.

### F.     Intentional Infliction of Emotional Distress (Count VI)[5]

Under Illinois law, in order to state a cause of action for intentional infliction of emotional distress, a plaintiff must adequately allege that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 683 (Ill. App. Ct. 1999) (citation omitted). To satisfy the first element of this claim, a plaintiff must show that conduct was objectively extreme and outrageous. *Id.* ("Mere insults, indignities, threats, annoyances, petty oppressions or trivialities" will not suffice.) The conduct must go

---

[5]The amended complaint mistakenly titles the emotional distress claim as "Count IV," when it is actually Count VI.

"*beyond* all possible bounds of decency, and [] be regarded as *intolerable* in a civilized community." *Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (emphases added). The emotional distress must be "so severe that no reasonable man could be expected to endure it." *Lundy v. City of Calumet City*, 567 N.E.2d 1101, 1103 (Ill. App. Ct. 1991) (dismissing an emotional distress claim for failing to allege extreme and outrageous conduct).

Simply put, the record does not include facts from which a reasonable jury could conclude that FedEx's conduct was so extreme and outrageous as to constitute intentional infliction of emotional distress. At worst, FedEx silenced Weathers from discussing his college degree and his religion, and failed to accommodate his belief that he had to answer questions about religion. When compared to what is required to state a claim for emotional distress, FedEx's conduct falls well short. *See Combs v. Insurance Co. of Illinois*, 497 N.E.2d 503, 508 (Ill. App. Ct. 1986) (allegations that insurance company delayed or refused to make payments due under policy resulting in impoverishment and great mental anguish and stress were not sufficient to state a claim for intentional infliction of emotional distress); *Public Finance Corp. v. Davis*, 343 N.E. 2d 226, 227 (Ill. App. Ct. 1976) (conduct was not extreme and outrageous when debt collectors disseminated false information about debtor, contacted debtor to collect the debt while she was with her daughter who was hospitalized with a brain tumor, and entered debtor's home under false pretenses to investigate what she owned). Lastly, Weathers's resignation letter did not suggest that he was leaving

because he could no longer endure extreme and outrageous conduct; to the contrary, he praised FedEx.

Weathers argues that FedEx's conduct was intentional, deliberate, willful, wanton, and with malice, R. 37 at 14-15, but "it is not enough that the defendant acts with a tortious or even criminal intent, that he intended to inflict emotional distress, . . . or that his conduct can be characterized by malice." *Lundy*, 567 N.E.2d at 1103. What matters is the actual conduct itself, and Weathers has not shown a single action by FedEx that comes close to overcoming the high hurdle established by Illinois case law. Because no reasonable jury could conclude that FedEx engaged in intentional infliction of emotional distress, FedEx's motion for summary judgment is granted as to Count VI.

## IV.

For the reasons stated above, FedEx's motion for summary judgment [R. 28] is granted in part and denied in part. The failure to accommodate claim (Count III) of the amended complaint survives [R.26].

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: November 1, 2011